Okay, the next case is number 151311, Radio Systems Corporation v. LaLure, Mr. Mann. Good morning, Your Honor, and may it please the Court. This case presents a very fundamental issue. That comes down to when you have issues of fact, when there's evidence on both sides of a material issue of fact, who gets to make the final call on that? A jury or the judge? That is exactly what was presented in this case. We had a six-day jury trial, Your Honor, during which a number of witnesses were called. We started out with nine jurors. One of them had to drop out during the case. Six jurors listened to six days of testimony. Six jurors saw a number of exhibits. Six jurors got to handle the actual products and look at the prior art and so forth. The jury deliberated for two and a half days. The jury came back with a split decision. I did not win entirely. The jury came back and said, no, some of these patent claims are invalid. But importantly, the jury said two of the claims are not invalid. In other words, Radio Systems failed to prove with clear and convincing evidence that two of the claims were invalid. The jury also said those claims are infringed. The reason we are here is, despite all that, the trial judge said, no, I disagree. In my view, this is clear and convincing evidence. The jury is wrong. Didn't he say, though, what he actually, I think, said is that there is no evidence to support a contrary conclusion, that no reasonable jury could have concluded as the jury did? And so then the question becomes, what is the substantial evidence to support the jury's verdict? So why don't you point us to that? Certainly, Your Honor, I'd be happy to do so. In saying that, that's just really a fancy way of the judge saying I disagree. What happens, we have to keep in mind here, that Radio Systems has the burden of proof on this. Radio Systems has to come in and prove with clear and convincing evidence that the claims are invalid. It's analogous to a criminal matter where the state has to prove guilt. It's entirely, maybe dangerous, but a defendant can say, I'm resting. I'm not going to present any contrary evidence. This fails to rise to the appropriate level of proof. But beyond that, Your Honor, so we could say, I mean, at the risk of being overly simplistic, we could say that doesn't rise to the level of clear and convincing, and if the jury agrees with us, they get to make the determination of credibility. But in this particular case, there was substantial cross-examination. I didn't have an expert of my own, and my infringement expert was bounced out of the case by the trial judge. Furthermore, we had to go second. Even though we were the patentees, we were not realigned, so we had to listen to the arguments of invalidity first. What we did was we subjected their expert, Mr. Westrick, to substantial cross-examination. We pointed out specifically in the context of the relevant claims, claims 3 and 17, with respect to claim 3, where it talks about particular dimensions, we pointed out, you have to admit the obvious, no dimensions are shown in that patent. Mr. Westrick was forced to conclude that the patent did not show any particular dimensions and that it was pure guesswork on his part as to whether the three-eighths inch limitation was met by the Bonghi reference. Furthermore, Mr. Westrick testified, allowed him to admit on cross-examination, that the little posts that stick up there are threaded, and it would be difficult for those to actually contact the animal's skin. He also testified that it was well known in the art to take electrode probes and screw them onto the posts. We had a number of those probes already admitted into evidence, and if those probes were in fact screwed onto the Bonghi reference, they would vastly exceed the three-eighths limitation. This is all materials that Mr. Westrick testified to. With respect to claim 17, the business of whether the housing is designed to contact the animal's skin, the Bonghi reference clearly shows a strap overlying the housing. So as shown in Bonghi, everything we can see in the Bonghi reference shows a strap interfaced between where the housing is and where the animal's skin would be. Mr. Bonghi testified, well, even though that's what it shows, it could be this, it could be that. It could have a narrow strip, maybe the housing sticks out farther. Again, it's pure guesswork on the part of Mr. Westrick. So to answer your question, I'm taking a roundabout way of answering your question, I would suggest that there's evidence in the form of lack of credible evidence. In other words, there's ample reason for the jury to listen to Mr. Westrick and say, I'm not convinced. I'm not sure this guy knows what he's talking about. I'm not sure. In essence, it's credibility determination, Your Honor. I seem to recall reading that there was a move for, I guess, a directed verdict after the presentation of all the evidence, and the judge denied that. He did. Then it went to the jury? Pardon me? Then it went to the jury? It did, Your Honor. That's exactly what happened. During the course of the trial, I believe at the conclusion of the various cases, oral motions were made for a directed verdict. The judge said, well, I'm paraphrasing. He said, I don't think I can decide right now, JMOL, I'm going to let it go to the jury. But after the jury verdict came back, he was not shy at all about saying the jury is wrong. So that's exactly what happened. During the course of the trial, he said, I'm not going to direct the verdict at this time. What do you argue? What do you say was the effect that the judge put the order of the presentation of the evidence, changed the order? You're playing to Friday, and you went second. No, we were actually, we are the patentee. This case started out as a declaratory judgment action, Your Honor. We are the patentee. We threatened, actually, this goes back a number of years. They had you go second. They had us go second. So they get to put on their case of invalidity and non-infringement first. Then we got to put on our case of infringement, and then Radio Systems was able to put on a rebuttal case. They got to open closing arguments. Why does that matter to you in this case? It doesn't really matter. Well, aside from the fact that we ultimately have the burden of proof as the patentee arguing infringement, it's always nice to go first. I've had a number of cases where it's been in a declaratory judgment. In all other cases, the court, sometimes sui sponte, has just realigned the parties. That's not a basis of our appeal. I'm just pointing it out as something a little bit unusual. I would rather have done it in the normal order, but it was a good experience, I guess, in that sense. Looking at Figure 12 of, how do you say it, Bungie? Bungie, B-R-U-N-G-E. Yeah. You were saying that something, I think you were trying to say that thread electrodes, which are identified as elements 58 and 59, don't contact the dog's skin. Is that right? Well, I don't see how that would be so. Well, I didn't, I'm sorry, Your Honor, I don't mean to say that. I'm not sure if that was presented. We did bring out the fact that those don't stick up very far, and it was ambiguous whether they would contact the dog's skin. I want to point out we made an inadvertent typographical error in our brief, and I think we pointed it out in our reply brief. We never had a sample of the Bungie product. The Bungie product, as far as we know, we're not sure it ever even physically existed. So all we were going on is the drawing here. We never had an actual physical product that we could inspect. So we were talking during cross-examination, and I was pointing out that those things don't really stick up that far, and would they make good contact with the skin, and Mr. Westbrook wasn't sure. The important thing is he did concede that they are threaded. There's a nut you can see that's on there, and that it was common practice in the industry to have thread-on electrodes. You see pictures of those at page 26 of our opening brief. I see where you've said that, but I also see where the reference itself say that 58 and 59, while they're threaded electrodes, they are, in fact, electrodes themselves. Oh, well, they certainly conduct electricity. And then 61 and 60, they are used to—those are nuts to screw them on. And so in this particular reference, there's been a decision that the electrodes would be threaded electrodes, and the electrodes not only serve as the electrodes, but they seem to also serve as an additional element to secure the housing to the collar. But I don't think that there's any—I'm not sure that I think it's reasonable to think that you're supposed to stick something else on here to serve as the electrode when 58 and 59 are expressly described in the patent as being the electrodes. They're being electrodes, but it says absolutely nothing about them contacting the animal in any way, shape, or form. It's clear there's no dispute that those things do pass electricity, and what you've been euphemistically calling the stimulus signal goes through those. But what is ambiguous is whether— If they don't actually contact the animal, what would be the point of them? Well, because you could screw on another piece, another element that would conduct it. It would be an extension piece in essence. Does the reference say that you should so add such a thing? It doesn't. It doesn't. The implication might be that it's not necessary? It's possible. That's what we're saying. There are a number of uncertainties about this. This is exactly what we were dealing with at the trial. Bonghi reference, what you have is this drawing, another one very similar to it, and you have a couple of paragraphs of description that don't talk at all about how this thing works in the context of an animal. I think what Bonghi was talking about is how things are mounted within the housing. So it's a very, very cryptic reference. But there's got to be contact, right, for the item to work, for there to be an electrical charge. There has to be contact between some sort of conductor and what we see at 58 and 59. Yes, but what we're not sure of is whether the animal skin directly contacts what we see at 58 and 59 or whether there's an extension piece. You're absolutely correct, Your Honor, that something has to conduct the electricity from these electrodes to the animal skin. What is unclear is whether there's any intervening structure. This is what I tried to bring out during my cross-examination of Mr. Westrick. But didn't Mr. Westrick say at A3560 that these would, in fact, contact the skin of a dog? He said that they would, but he also pointed out that he hadn't seen it and that it was common in the industry to use screw-on electrodes. That doesn't mean you're saying because he hadn't seen this reference, the Bonghi patent in a practical application, that means it doesn't exist? No, what I'm saying is the jury would be free to conclude to discount his evidence or discount his testimony. The fact that an expert says something does not mean that it has to be accepted. This happens all the time where witnesses stick to their story, but the jury sees what's going on and doesn't believe it. I'm saying in this case, because it was unclear and because there were inconsistencies in Mr. Westrick's testimonies that were brought out during cross-examination, that the jury would be free in this case to say, I'm not convinced. I'm not clearly, it's not clear and convincing, which again is a standard. I think the crux of your argument really depends on the statement that it's unclear in the reference. Well, it's unclear in the reference, and the other thing we have to talk about is we're not sure, and this is consistent with this court's case law, there are no dimensions presented here. We're sort of guessing that these electrodes here would stick up less than three-eighths. And again, it sort of raises the question, we have to sort of assume. Isn't there expert testimony that they did? No. We do not, I think he's making, he's basing it, he's concluding that based on what he sees in the drawing, but the court's precedent, as I understand it, says unless there's something clear, you can't just use relative measures or relative dimensions in the drawings to make dimensional conclusions. I thought that you couldn't, that it was okay to look at relative measurements, but that it's not appropriate to actually take out a ruler and start measuring things. But again, we do not know how big this thing is. What size dog is this on? Is this on a St. Bernard? Is this on a Chihuahua? We don't know. These are the things that are not clear in this, and again, these are why I'm saying that you can't say, my argument to the jury was this does not rise to the level of clear and convincing. Certainly, it's suggestive, it's possible. I'm not saying that no way, no how could Mr. Westrick be right. What I am saying is I disagree that no way, no how could we be wrong on this. And when it's a question that could go either way, and I believe that in this case, it is a question that could go either way, the proper body to determine that question is the jury, not the judge, not us a year and a half and 3,000 miles away later trying to decide this. The jury is the one that heard this stuff, that's what our system says, and I think on this case there's certainly enough here for the jury to have reasonably concluded that no, I'm not convinced that these claims are invalid. And again, same thing with whether it's designed to contact the animal's skin. You look at the Bonge reference, now what it does show, it clearly shows that strap. Mr. Westrick was guessing on how, well there could be other structure, the strap could be narrow, and the sides of the housing might contact the animal's skin and so forth. But all that's required to contact the skin is the electrodes in the high points, right? No, not in Claim 17, Your Honor. Claim 17 says that the housing is designed, has an upper surface that's designed to contact the animal's skin. Claim 17 has an entirely different element that we said is not, I don't know if I have a copy of this, we could have it somewhere. The Claim 17 says it's the housing has an upper surface that is designed to contact the animal's skin. That's why I am focusing on the business of the strap between the housing. Certainly the electrodes go through, but that's not relevant. Here it is, this appears on page 36 of our opening brief, Your Honor. We have it underlined. The housing having an inside surface designed for contacting the skin of the animal during use. Bonge clearly does not show that. Mr. Westrick was saying, well, that's how it could be. But again, that's pure guesswork on his part. Again, our argument is, well, the jury could accept that. The jury, importantly, is free to discount that and say we're not convinced. Wasn't there expert testimony to the effect that the inside of the collar housing would, as designed, repeatedly contact the skin of the dog during use? I'm sorry, Your Honor? Wasn't there expert testimony to that effect? Well, I think he tried to, on redirect, he tried to say that. He tried to say, well, it could be. I mean, the fact of the matter is we brought out he's never seen this. He doesn't know. He's guessing. Now, I believe during redirect it was brought out, well, maybe couldn't the strap be narrow and couldn't the outside portions of the housing do this? But again, he didn't do that during his direct testimony. He didn't do that during my cross-examination. I believe it happened during redirect. And again, a jury may say, well, it's a little too late at this point. Again, they don't have to. I think by his own admission it was guesswork. He's not saying, yes, I saw it, and that's how it is. He's saying it could be this way. And again, the jury is free to say we don't buy it. So, you know, going back to that figure 12 I pointed to before, you've got those electrodes, 50 and 59. But I think maybe your question, one question I have for you is those parts that I've seen somewhere labeled as parts D and E, the alleged high points, right? Why aren't they part of the inside surface of the housing? Because the housing, as determined by the court, says the housing is a fully enclosed structure for supporting the electrodes. This is part of flame construction. When we were back here three years ago, this was part of the stuff we were talking about. Sure, but the claim says the collar housing, sure, contains certain things. But it also says that it has an inside surface that's directed towards the animal. Well, then these things we were saying are not part of the inside surface. The inside surface would be the part that goes below the strap there. Again, it becomes very unclear. What about where the claim says the inside surface is the part that's directed to the animal? It defines the inside surface as being the part directed to the animal. So this is clearly directed toward the animal. It says in the reference that it's integrally, I think the language is integrally embedded, or part of the, let me get the exact language, integrally molded. It's integrally molded. Integrally molded with the housing is the implication. What we tried to bring out, and I think we did bring out on cross-examination, is that these are portions external to what the housing is as defined by the patent, a fully enclosed structure. What we're saying is this has slots here to enable the strap to go through, and furthermore that those elements, D and E, do not support an electrode, which is another part of the definition of the housing as determined by the court during flame construction. So again, we get into this, it's not clear. Again, it's like, well, what's the housing? What's the inside surface? Is the inside surface that part that the electrodes actually go through, or is the inside surface these parts, D and E, that don't even contact the electrodes? This is where it gets into sort of the house of cards here. We're not sure what Bonghi actually shows, and given that it's unclear what's what in Bonghi in the context of the flame construction, I think the jury was free to say, well, this isn't clear and I'm not convinced. Okay, let's hear from the other side. Certainly, Your Honor, thank you. Mr. Britton. May it please the Court. As far as the order of proof that was discussed earlier, we were the DJ plaintiff in the case, and given the disposition of the case at the time that it was actually tried, the primary issue was the invalidity issue. We had not much, based upon the court's construction of the claims, we had not much of an infringement case. So I think that the court's determination on their motion to reorder the case was that, really, we were the real party that had the burden of proof going into trial. So the court allowed us to go first. I don't see that it prejudiced them in any way. But getting to the more substantive issues, this court had said many times that the presumption of validity is a procedural device. It's not evidence in and of itself. The evidence, once we put on a prima facie case, the burden of coming forward with evidence shifted to the patentee. We had put on evidence from Mr. Westrick, extensive testimony as to anticipation and obviousness. That testimony was corroborated by two other witnesses, Dr. Manini and Mr. Gehrig. I would say they did not testify as experts, but they testified as skilled in the art. The references themselves were before the court and the jury. And so we were in a situation where the proof that went on in the court was solely the proof that we put on. And there was no rebuttal testimony given, no rebuttal evidence. Even if you throw out the testimony of Mr. Westrick, they still have an obligation to put on some kind of evidence that was directed to, for example, Bongee not showing what it clearly shows. It shows electrodes that don't extend as high as the high point surface. It shows high point surfaces that clearly would contact the skin. Westrick's testimony was consistent with what the reference showed. Even to the extent, I think, if you talk about the little openings where the strap slides through, it's quite apparent that that collar strap has to be narrower than the overall dimension or the cross dimension of the collar housing. That suggests that along that whole side of the collar housing, you're going to have contact with the animal, not just at those points D and E, but you're going to have it all the way along the side. So you are looking at a reference, when you look at Bongee, that clearly and convincingly shows electrodes that are shorter than the high point surfaces. If they're shorter, they can't be more than three-eighths inch higher. So you have a clear and convincing showing there, and you have these points D and E that clearly contact the skin of the animal during use. So three and 17 are anticipated. I've got plenty of time left, but I fear that in taking it, I'm just going to parrot what I've already said in my brief. Does the panel have specific questions that concern it? Any questions for counsel? I don't have any questions. Any questions for counsel? Okay. I will surrender my time. Okay. You have a couple of minutes, but limit it to rebuttal, please. Certainly, Your Honor. I take exception to the statement that we did not put on any sort of case, that we did not attack anything. Very clearly, they did not want to admit infringement. They bounced our infringement expert, and I had to make the case for infringement through cross-examination of Mr. Westrick. He was able to read the claims on a number of pieces of prior art. Over the radio system's objections, I got him to do the same with the accused product, and he was forced to admit that there was infringement. So that was, in fact, contested. Second, we did put on rebuttal testimony, at least with respect to obviousness. Mr. Lawler testified during his direct examination, during his direct testimony, that there was a long-felt need here. He saw the dogs were getting sores on their necks because these collars were too tight and the electrodes were digging into their necks. Nobody had done that before. He saw the problem. He solved the problem. He testified that at a trade show, radio system's president came up to him and talked to him for a half hour about this, talking about all this great, was very interested in this technology. Shortly after Mr. Lawler came up with this, radio systems comes out with its infringing collars and they start touting for the very first time that these collars are comfortable for the dogs and they do not cause sores. So there was rebuttal evidence put on during this case, and certainly with respect to the obviousness. I think we addressed this in a brief. I'm going over this. So I would simply want to bring that out. And then as far as the strap on the bongy collar goes, we don't know whether the strap is wide, wider than the housing or not. We don't know whether these lugs, and I brought this out again, do the lugs stick out to the side and the strap goes over the entire housing? We don't know. Nobody's seen this thing and you can't tell from the pictures. Furthermore, if you have a strap, the strap's going to lie on top of the housing. There's going to be a gap. Do we know that that gap is going to be big enough or small enough so that it contacts the animal's skin? We don't know that either. Do we know that it's designed for contacting the animal's skin? Not whether there's inadvertent contact. Mr. Waller designed his patent so that it conforms to the shape of the animal. It's designed to contact the skin, support the skin. It's shown in one of his figures where he shows the skin going over the bumps and how it makes contact with the animal. That's what's meant by designed to contact the skin. We don't know that from bongy. Again, those reasons, because of all these questions, because these things are unclear and because nobody could testify clearly what bongy was doing, the jury had no choice but to say, well, okay, we're not convinced. For that reason, Your Honor, I would submit that the jury was correct in this or, more importantly, that there was substantial evidence to support the jury's finding and whether the district court likes that or not, but that's our system. The jury made the call. They did it based on proper evidence, and the verdict should be reinstated. Thank you, Your Honor. Okay. Thank you, Mr. Mann. Mr. Britton, the case is taken under submission. That concludes the arguments for this morning. All rise. The Honorable Court is adjourned from day today.